*256 OPINION OF THE COURT
Daniel H. Prior, Jr., J.
Petitioners challenge the legality of respondent’s amendments to 11 NYCRR part 52 relating to the prohibition against requiring or considering body fluid tests for evidence of Human Immune Deficiency Virus (HIV) in the application for or the risk management determinations of insurability for health insurance (individual and small group).
Petitioners set forth seven separate causes of action arguing the invalidity of the regulatory amendments.
Initially, the court determines that under the proper circumstances and with proper reasoning respondent Superintendent has broad regulatory powers relating to health insurance policies, including the application process, underwriting standards, categorization of insurability and classification for rates and coverage. In reviewing a challenged regulation, this court is not free to merely disagree with respondent’s conclusion and substitute the opinion of the challengers.
CLAIM ONE: LACK OF STATUTORY AUTHORITY
Petitioners key in on Insurance Law § 3217 (b) (4) and respondent’s reliance upon the certification of the Commissioner of Health. In adopting the regulation, respondent received and heavily relied upon the May 1, 1987 certification of the New York State Commissioner of Health, David Axelrod, M.D.
Prior to analyzing the validity of proceeding under Insurance Law § 3217 (b) (4), this court observes that respondent held public hearings and received evidence and comments on the proposed regulation. Even before the certification and proposal of the regulation, respondent was studying the topic and keeping abreast of developments in the subject matter. Accordingly, respondent was in a position to reach independent conclusions, or to independently reach the same conclusions — assuming the conclusions have a basis in fact and law. These issues are addressed below under claims more on point to same.
Insurance Law § 3217 (b) (4) is a consumer protection measure designed to eliminate deceptive practices and to insure that health policies offer genuine benefits for the premiums paid. The legislative history as documented by petitioners’ memorandum exhibits D, E, F, G, H and I clearly demonstrate *257 this. The simple reading of the subject statutory subdivision reflects a reference to policy or contract "provisions” to be eliminated and does not authorize the setting of underwriting standards or qualification for policy issuance. The terms used by section 3217 do not refer to "policy form” as defined by Insurance Law § 3201 as to include applications.
Both the regulation and the certification do refer to policy or contract provisions and do not go to deceptive practices or genuine benefits. Therefore, the regulation is not authorized by Insurance Law § 3217 (b) (4) specifically or section 3217 generally. It was an error of law for respondent to rely upon the certification.
The other statutory provisions relied upon are Insurance Law §§ 201 and 301 which, in granting respondent power, necessarily require further statutory authority express or reasonably implied.
Insurance Law § 3201 (c) (3) states: "(3) The superintendent may disapprove any accident and health insurance policy form for delivery or issuance for delivery in this state if the benefits provided therein are unreasonable in relation to the premium charged or any such form contains provisions which encourage misrepresentation or are unjust, unfair, inequitable, misleading, deceptive, or contrary to law or to the public policy of this state.”
This section clearly grants respondent broad powers and discretion. Likewise, Insurance Law § 4224 permits respondent to prevent unfair discrimination between individuals of the same class.
This court determines that statutorily in the consumer protection area, Insurance Law §§ 3201 and 4224 grant respondent broad regulatory discretion in the general topic area (factors which can or cannot be considered in the application process for insurance) subject to correct facts, circumstances, reasoning and conclusions.
CLAIM TWO: USURPATION OF LEGISLATIVE AUTHORITY AND UNCONSTITUTIONAL DELEGATION
The existing statutory authority granted to respondent— while broad in the area of insurance and consumer protection related thereto does not permit respondent, by insurance regulation, to establish policy outside the insurance field, except as may be incidental to the primary insurance purpose *258 of the regulation. This is particularly true where the policy involved does not effectuate an existing public policy.
AIDS, ARC and HIV are all of recent vintage — the significance of same is only very recently becoming known. Public policy is developing — witness: information and education programs, counseling and research funding. As the fiscal impact has become apparent, the placement of the financial burden of the cost of care has not been established.
The subject regulation attempts to do just that for the segment of the population who are not covered by existing health insurance policies. In doing so, it radically departs from existing public policies of risk underwriting management.
Had respondent factually established the irrelevance of the HIV-positive status to normal risk underwriting standards, then he would have had an insurance-related consumer protection basis supporting the regulation — same would then be statutorially and constitutionally supported.
Absent such a basis, the regulation faces Boreali v Axelrod (71 NY2d 1) issues. Upon the decision below, the court need not reach these issues.
THIRD CLAIM: INCONSISTENCY WITH INSURANCE LAW § 4224
Insurance Law § 4224 prohibits any unfair discrimination between individuals of the same class. Respondent argues that the subject "Regulation, in effect, defines those who test sero positive for HIV and those who do not as 'individuals of the same class’ ”.
The plain meaning of "same class” as used by the Insurance Law is actuarially similar in terms of morbidity and mortality. Petitioners argue that the statute, by implication, authorizes reasonable discrimination between individuals of different classes.
Being sero-positive means having HIV. Testing positive for HIV is an accurate indicator as to who has HIV — there being one false positive test result from the ELISA-ELISA-Western Blot Test Series (E.E.W.B. Test) using the same blood sample out of 20,000 tests — an error rate of .005%. The court need not and does not consider the submissions of petitioner, particularly as it relates to information not available to respondent as of his regulation’s effective date.
HIV causes AIDS and ARC (AIDS Related Complex).
*259 While the percentages of progression from HIV infection alone to AIDS and ARC is not fully known, respondent cites 20 to 30% of those infected in 1986 will develop AIDS by 1991 and that 30 to 50% of HIV-positive individuals will develop AIDS within 5 to 10 years after sero-positivity is confirmed. Respondent’s exhibit I continues that the natural history of the disease is not fully defined and that "the proportion of infected persons who will develop AIDS or ARC is not yet known, nor is the time frame for the occurrence of these conditions”. In adopting such figures, respondent neglects the ARC progression rates, and the inability of studies (due to the recent nature of the epidemic) to extend out further in time.
AIDS and ARC are expensive illnesses from the health cost of care perspective, even using respondent’s figures. There is no known cure. AIDS is fatal.
This court therefore determines that Insurance Law § 4224 provides no basis for the subject regulation as the class of individuals consisting of HIV sero-positive (as E.E.W.B. tested) individuals is distinctly different in terms of morbidity, mortality and health expense risk from that of those who do not test positive and said difference is substantial. Petitioners argue that said section implies that different classes are or should be treated different with consideration of the difference. Inasmuch as the section does not directly address the issues herein, it sufficiently implies a public policy of risk classification which must be considered in the exercise of regulatory authority. It is arbitrary and capricious to deem HIV-positive high-risk individuals to be part of the standard classifications.
FOURTH CLAIM: INCONSISTENCY WITH INSURANCE LAW § 3105
Insurance Law § 3105 relates to representations and misrepresentations in the application process for insurance and the effects of material misrepresentations. The subject regulation prevents insurance company inquiry into the area of a specific factual topic.
Implied by said section is a public policy of permitting insurers to inquire into material facts underlying actuarial risk management and of not requiring insurance carriers to accept and insure all applicants regardless of the facts. It implies disclosure of relevant facts.
As to the relevancy and materiality of prohibited inquiry— the court refers to its discussion of the preceding claim. While *260 Insurance Law § 3105 does not directly address respondent’s authority — it sufficiently implies a policy which must be considered in the exercise of regulatory authority under other statutes such as Insurance Law § 3201 (c) (3) which discusses forms and provisions which "encourage misrepresentation or are unjust, unfair, inequitable, misleading, deceptive, or contrary to law or to the public policy of this state.”
FIFTH CLAIM: ARBITRARY AND CAPRICIOUS
Respondent, by memorandum of law, has accurately stated the standard of review of a regulation. The court must examine both the substantive and procedural basis of the regulation. The court reviews both the Commissioner of Health’s certification and respondent’s promulgation.
The certification is reviewed in the context of an Insurance Law § 3217 certification {but see, discussion, claim one, above) and in light of respondent’s reliance on same as a proper certification. The certification is also reviewed in the context of a public health official expertise and respondent’s reliance upon same for "facts”, reasoning and conclusions, as well as respondent’s independent adoption of same (or similar) for findings of facts, reasonings and conclusions. Respondent acknowledges reliance upon the certification.
While the Department of Health defends their certification herein, it is unclear how much and to what extent the background and basis of the certification were known to respondent and independently relied upon by respondent in his promulgation.
HIV, AIDS and ARC are unique problems in many respects. Even though much has been discovered in the several years since their identification a lot remains unknown. HIV is communicable (see, Matter of Doe v Coughlin, 71 NY2d 48) and causes both AIDS and ARC. They are currently incurable. AIDS is almost always (if not always) fatal.
Certification reason No. 1 has been somewhat factually addressed above under the third claim. To a significant degree the reasoning in the certification is in ambiguous conclusory terms. It defines sero-positive as being exposed to the virus. While not inaccurate, it neglects to state and fails to imply the fact that HIV sero-positive invariably (almost always) means a current HIV infection (alive and communicable).
In the papers it is alleged that "future vaccination tests” may produce sero-positive individuals and thus the use of such *261 results would unfairly deny needed volunteers health insurance coverage. The court finds this speculative and assumes that should such volunteers need to apply for insurance they would be able to document the situation, and it appears that the respondent has the power to protect such individuals.
Reason No. 1 goes on to state that it is unknown ("not definitely known”) how many HIV-positive individuals will progress to AIDS and ARC. This might be true, but the Health Commissioner and respondent have (and herein rely upon) some significant figures on the topic (again, see, discussion above, third claim). Accepting the conservative figures used by respondent, which are fairly well established on the conservative (minimum) side, there is sufficient and substantial knowledge to make valid conclusions and findings. What is "not definitively known”, and the "significance” "not medically clear”, and the limitations on the "limited predictors” all relate to the possibility of worse statistics (from an HIV-positive individual’s perspective) or the hows and whys of the disease as it effects specific individuals.
For insurance actuarial purposes in terms of mínimums for risk underwriting, enough is known for significant predictability.
In order to determine the rationality or arbitrariness of reason No. 1, the court analyzes the conservative "known” facts as they are applied to known and acceptable health insurance underwriting standards and policies and as set forth by respondent. The court refers to the July 24, 1987 affidavit of Olds with its exhibit A. Without accepting the HIV, AIDS and ARC facts therein, the underlying risk classification and uninsurability underwriting standards are unchallenged.
The court makes a simple comparison. A finding that an individual smokes does not mean that said smoker shall, in fact, become ill, disabled or die early as compared to norm for nonsmokers. However, smokers as a classification is permitted by public policy — the basis being significant actuarial risk differences between the classifications.
Currently, AIDS and ARC are expensive illnesses. Assuming the low-end figures used by respondent for AIDS cost (AIDS lifetime in-patient hospital services, 18 months = $30,000); and not considering out-patient, ambulatory or home-based services insured medical expenses; and, assuming an HIV to AIDS rate of 20 to 30% in 5 years or 30 to 50% in 5 to 10 years; and, not considering the disease of ARC and its related *262 medical expenses, clearly shows that a group consisting of HIV-positive individuals will have significant average AIDS in-patient hospital expenses. A group of 100 HIV-positive individuals could expect approximately 25 members to incur a total of $750,000 in in-patient hospital AIDS expenses during a five-year period after testing positive or $1,500 per group member per year over five years.
If you add in ARC medical expenses, AIDS non-in-patient medical expenses and medical expenses unrelated to HIV, AIDS and ARC — the groups’ average annual medical expenses increase.
This court finds that testing for HIV sero-positivity produces statistically valid basis for actuarial risk classification purposes as an accurate, significant and substantial predictor of morbidity, mortality and future medical expenses. Conclusions to the contrary have no support in the facts and are factually in error.
Certification reason No. 2 relates to the social, financial and psychological impact of being denied health insurance coverage. The impact, however, is not unlike that affecting others who find themselves uninsurable for any reason. Certainly no one appreciates being found to have worse than normal risk for morbidity and mortality. However, this is a social problem which has been with us since the advent of insurance and actuaries. The basis of insurance is the pooling together of resources to share and spread generally equal risk with one risk classification not subsidizing a significantly higher risk group. This has been accepted public policy.
Lack of insurance coverage is a major financial problem for anyone not poverty stricken and thus qualifying for welfare’s Medicaid. Routine and preventative care may be neglected and serious illness or accident can result in financial disaster and ruin.
The State is not without power to address these health-related financial tragedies. Welfare’s Medicaid is part of that social safety net adopted as policy within this State.
Insurance has never been an "entitlement”. The State has never created a policy of providing health insurance to everyone regardless of risk or in disregard of known substantial risks.
Certification reason No. 3’s conclusion appears to be social conjecture and unsupported by objective fact. Unexpected discovery of sero-positivity could very easily lead a person to *263 health education, counseling and life-style modification rather than to discourage same. It is speculation either way.
The denial of individual or small group health insurance is not a penalty or a stigma as the terms are commonly used. There is no factually demonstrated relationship between availability of health insurance (uninsurability) and the New York State Department of Health’s ability to educate, counsel and gain the cooperation of the HIV-positive and the HIV-at-risk population.
With the possible exception of a submission to a voluntary testing and then a required disclosure of a positive result, there would appear to be no relationship between AIDS (HIV) education, counseling and voluntary behavior modification programs and medical qualification for health insurance. However, this argument is blunted if the individual is going to be tested in any event.
At oral argument, respondent’s counsel acknowledged that this was an unknown area.
Certification reason No. 4 relates to breaches of confidentiality by improper and unauthorized disclosure of HIV-positive test results followed by improper or illegal discrimination. This is a remote problem. It would apply to voluntary testing programs (including blood donations), as well as insurance testing. Such a problem can be addressed and substantially eliminated by regulating confidentiality of test results and improper discriminatory practices which would assist with the comprehensive solution of a much broader problem than an insurance company’s confidentiality problem which has not been factually established to exist. Confidentiality is not new to the insurance industry in both underwriting and claims. Problems with same have not been factually demonstrated or suggested to exist.
Certification reason No. 5 is clearly impractical and substantially too late for effective risk screening, which is the purpose of the testing in the first instance. Novick’s affidavit, paragraphs 30 to 35, clearly illustrates his T-cell test’s limitations in the health insurance application and underwriting process.
Beyond the certification, respondent Corcoran, by affidavit, has set forth his basis for the regulation. Paragraphs 17 and 18 of his August 17, 1987 affidavit list some of his reasons.
In paragraph 17, respondent keys a portion of his argument on the predictive value of the HIV test — same has been *264 addressed above under the third claim and fifth claim — certification reason No. 1.
Encouraging availability of health insurance is a State policy, but it has not been with disregard of normal actuarial underwriting standards for risk classification. The ignoring of risk classifications, particularly a significant one such as HIV positivity, is not without its impact on availability of insurance to the public as availability is directly related to affordability. Respondent has not analyzed this for the court as a basis for his regulation.
If his further concern that the denial of individual and small group health insurance based upon a positive HIV test finding relates in any manner to the fiscal viability of the State’s welfare Medicaid program — equal concern must be given to insurance rates and the financial viability of the insurance companies and their policyholders.
The placement of the financial burden of the HIV, AIDS, ARC epidemic is of significant public concern. As a key and critical issue being intentionally impacted by respondent’s regulation, respondent’s "facts” are grossly inadequate.
Respondent’s statement in paragraph 6 of his August 17, 1987 affidavit that the financial impact on the insurers is speculative, and if it materializes could be mitigated, is belied by the record and respondent’s concern for the Medicaid program’s fiscal viability.
Both petitioners and respondent make reference to Confronting AIDS, Directions for Public Health, Health Care and Research by the Institute of Medicine National Academy of Science 1986. At page 21 (page 22 is missing), the report discussed Health Care Costs Resulting From HIV Infection. While using minimum figures far in excess of those used by respondent, it cites US Public Health Service estimates of $45,000 to $91,000 + in direct care cost per AIDS patient for the year 1991. These figures do not include cost of care to ARC patients and sero-positive individuals which the Public Health Service believes to be substantial.
While estimating future costs necessarily cannot be exact, especially with limited current data, nevertheless, there is sufficient data for prudent insurers and regulators to determine the insurability (or uninsurability) of the classification of HIV-positive individuals. Once a risk factor exceeds the minimum standards for uninsurability it matters not how many times the insurability standards have been exceeded.
*265 Respondent has provided no valid basis for his conclusions that petitioners’ position on the fiscal impact of inclusion of an uninsurable risk classification into the standard insurable risk classifications is speculative. Petitioners have established a firm foundation of minimum accepted facts and statistics in order to establish reasoned conclusions on the fiscal implications of the HIV epidemic on individual and small group health insurance policies.
The regulation places high-risk persons who are infected with HIV in the same class as low-risk noninfected policyholders. This of necessity and as demonstrated by the affidavits submitted means that the low-risk uninfected policyholder will be required to subsidize the policyholder infected with HIV, to the extent the insurance can increase its rate (with the insurance company absorbing the remainder).
The regulation does not afford similar protection or economic advantage to other admittedly high-risk persons infected with serious health-threatening diseases such as cardiovascular disease, cancer, diabetes, leukemia, emphysema, high blood pressure, obesity, etc. The effect of the regulation appears discriminatory and affords the person infected with HIV a preferred status over persons infected with other health-threatening diseases or life-styles (i.e., smoking).
Of considerable concern to respondent is the effect of insurance testing as it may discourage HIV screening for health care and epidemic control reasons. The lack of factual justification for this speculation has been discussed above under fifth claim, certification reason No. 3.
This court determines that the regulation is arbitrary and capricious and lacks a rational or factual basis.
SIXTH CLAIM: VIOLATION OF EQUAL PROTECTION
As discussed above, the nonrecognition of HIV as a valid risk factor clearly provides the HIV high-risk individual with a preferred economic advantage over other high-risk individuals, including individuals whose high risk does not make them uninsurable.
Other than with speculatory reasons relating to the noncurable communicable nature of HIV and the need for education, counseling, "voluntary testing”, and behavior modification of HIV-infected persons, no factual-based reasons for the unique nonclassification of the HIV risk for health insurance has been submitted.
*266 The disparate treatment of similar situated persons (higher than normal risk of morbidity, mortality and increased health expense) without factual and rational basis is unfair and would appear to inappropriately discriminate between similarly and/or equally situated individuals.
However, these issues relate to the arbitrariness and capriciousness of the regulation and the court need not reach constitutional issues.
SEVENTH CLAIM: IMPAIRMENT OF CONTRACT
The regulation prohibiting certain inquiries upon an application for insurance does not appear to impair a contract. However, the prohibition of HIV inquiry and testing in claims administration relating to policy issued prior to the scheduled effective date of the regulation while HIV positivity was a valid and material underwriting factor and concealed in the application process would impair those contract policies.
CONCLUSION
This court determines that the subject regulation is null and void.