In the Matter of HEALTH INSURANCE ASSOCIATION OF AMERICA et al., Respondents, v JAMES P. CORCORAN, as Superintendent of Insurance, Appellant.

Third Department, February 15, 1990

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Rosalie J. Hronsky* of counsel), for appellant.

*Paul, Weiss, Rifkind, Wharton & Garrison (Edward N. Costikyan* of counsel), and *DeGraff, Foy, Conway, Holt-Harris & Mealey* for respondents.

*Morrison & Foerster (Kim J. Landsman* and *Debra Freeman* of counsel), and *Lambda Legal Defense and Education Fund, Inc. (Evan Wolfson* of counsel), for Lambda Legal Defense and Education Fund, Inc., *amicus curiae.*

*Gregory Serio* for Guy J. Velella, *amicus curiae.*

*Martin S. Kaufman* for Atlantic Legal Foundation, Inc., *amicus curiae.*

## OPINION OF THE COURT

LEVINE, J.

In this proceeding, petitioners, who are various insurance company trade associations and single companies selling individual and small group health insurance policies, challenge the validity of a 1987 regulation promulgated by respondent, the State Superintendent of Insurance. The regulation (11 NYCRR 52.27) applies only to individual and small group health insurance policies, constituting 10% to 15% of all health insurance policies issued in the State. It prohibits

insurers selling such policies from certain underwriting practices with respect to blood testing of an applicant for health insurance, or using test results, for evidence of the presence of the human immunodeficiency virus (hereinafter HIV). Specifically, the regulation absolutely bans an insurer from (1) considering HIV test results in determining an applicant's insurability, (2) requesting an applicant to submit to HIV testing, and (3) inquiring whether an applicant has previously submitted to an HIV test or about the results of any such test (11 NYCRR 52.27). The regulation was issued following publication of notice and an opportunity for public comments at an extensive hearing, and after the Commissioner of Health had certified that the prohibited practices were "contrary to the health care needs of the public" (Insurance Law § 3217 [b] [4]; 11 NYCRR 52.1 [j]).

HIV testing is used to determine an individual's risk of developing acquired immune deficiency syndrome (hereinafter AIDS), a disease by now well understood to diminish the human body's natural immunity to opportunistic infection and to certain malignancies, and which is at present invariably fatal. Concededly, there is a relationship between the HIV virus and AIDS and AIDS-related complex (hereinafter ARC), the latter affliction being manifested in symptoms from mildly to severely debilitating, but short of AIDS itself. There is now no practical test for the actual presence of the HIV virus in the body, but persons infected with the virus develop antibodies which can be detected by laboratory tests. The tests which are currently employed to detect HIV antibodies are the enzyme-linked immunosorbent assay (hereinafter ELISA) antibody screening test and the western blot assay used for verification.

In certifying to respondent that the use of HIV test results in connection with screening applicants for health insurance is contrary to the health care needs of the public, the Commissioner of Health gave five reasons: (1) HIV tests identify individuals who are seropositive, the majority of whom are asymptomatic, and it is as yet not definitively known how many of them ultimately "will progress to AIDS or * * * (ARC)"; thus, "[t]he tests are, at best, limited predictors of morbidity and mortality", (2) there are serious social and psychological impacts upon those denied insurance for testing HIV positive, who may never contract AIDS or ARC, discouraging them from seeking treatment for regular medical care and forcing them to become impoverished so as to become

eligible for Medicaid payment of their costs of health care, (3) the threat of insurance disqualification has an adverse deterrent effect on the only currently effective means of AIDS control, i.e., gaining the "willing" cooperation of seropositive persons to alter their private sexual and drug-abuse practices to stem the spread of the virus; penalties and stigmas, such as denial of insurance, will discourage voluntary testing and submission to counseling, (4) increased HIV testing by insurers will endanger confidentiality, resulting in unauthorized disclosures of test results producing economic and emotional hardships for seropositive persons, including discrimination in areas such as housing and employment, and (5) there are accurate tests available for diagnosing insurance applicants actually having AIDS or ARC and, therefore, testing for HIV seropositivity is unnecessary.

In petitioners' challenge to the validity of the regulations, they assert, essentially, that testing for HIV seropositivity is an actuarily sound means of identifying those persons having a high risk of contracting AIDS and ARC and that the regulation's effect is to mandate health care insurance coverage for this class of persons who are thus highly likely to incur substantial medical bills, persons who are not merely standard actuarial risks. Therefore, petitioners claim, the regulation is invalid as beyond the scope of respondent's delegated statutory authority to regulate underwriting practices. Alternatively, if statutorily authorized upon the Commissioner of Health's certification under Insurance Law § 3217, that section would represent an unconstitutional delegation of legislative power. It is further alleged that the regulation violates provisions of the Insurance Law prohibiting discrimination within classes of health insureds (Insurance Law § 4224) and permitting an insurance company to solicit relevant information from an applicant for health insurance and to disclaim coverage on the basis of material misrepresentations as to preexisting diseases (Insurance Law § 3105). The petition also alleges that the regulation is unconstitutional as denying equal protection (US Const 14th Amend; NY Const, art I, § 11) and as impairing contractual rights and obligations (US Const, art I, § 10; NY Const, art I, § 6).

Supreme Court (140 Misc 2d 255) held that the HIV testing ban regulation was invalid on the grounds that it was arbitrary and capricious and lacked a rational and factual basis in preventing insurers from identifying and classifying seropositive persons as health risks and that the regulation violated

the antidiscrimination and full disclosure policies underlying Insurance Law §§ 4224 and 3105. The court did not reach any other issues. This appeal by respondent ensued.

■ It is true that respondent has wide authority to prescribe regulations and in doing so may exercise broad power to interpret and implement legislative policy (Ostrer v Schenck, 41 NY2d 782, 785). Yet, his regulations must be consistent with and have a basis in the Insurance Law itself; "[t]he statute is the charter of [respondent's] authority" (Matter of Nationwide Life Ins. Co. v Superintendent of Ins. of State of N. Y., 16 NY2d 237, 245). An additional check on administrative rulemaking is that an administrator may be required to justify the *factual,* as well as statutory, basis for the adoption of regulations (see, Bowen v American Hosp. Assn., 476 US 610, 627; Schneider v Ambach, 135 AD2d 284, 291).

■ In the instant case, the purpose and effect of the regulation barring HIV testing or consideration of any prior such test is to mandate coverage for HIV seropositive persons in the general risk pool of applicants for individual and small group health insurance policies. The general rule in this State is that "an insurer * * * is free to select its risks and it makes inquiry of matters which it deems material to the risk" (Vander Veer v Continental Cas. Co., 34 NY2d 50, 52). This principle is embodied in the statutory provision, contained in the section enumerating the kinds of authorized insurance, that "[n]othing herein contained shall require any insurer to insure every kind of risk which it is authorized to insure" (Insurance Law § 1113 [b]). It is noteworthy that where, for social policy reasons, the general rule giving insurers autonomy in assessing and accepting risks has been deviated from, the Legislature itself has made specific provision therefor by statute (see, e.g., Insurance Law § 3216 [c] [4] [A] [mandating health insurance coverage for mentally disabled dependent children beyond age 19]; Insurance Law § 3216 [i] [10] [A] [mandating maternity care coverage in hospital, surgical or medical insurance policies]; Insurance Law § 3225 [barring initial policy denial or denial of renewal because of applicant's exposure to DES]).

Apart from inclusive provisions in the Insurance Law giving respondent general powers to supervise the insurance industry and issue regulations (Insurance Law §§ 201, 301), neither of which is directly referable to the regulation under attack here, respondent relies essentially on three sections of that law as the statutory foundation of his authority to issue the

regulation under review, namely, section 3201 (authority to approve or disapprove policy forms for, *inter alia,* health insurance), section 3217 (authority to issue regulations to establish minimum standards for the form, content and sale of, *inter alia,* health insurance policies) and section 4224 (b) (1) (prohibiting an insurer from unfairly discriminating "between individuals of the same class * * * in any of the terms or conditions [of any policy of accident and health insurance]").

■ All three of the foregoing provisions specifically relied upon by respondent are derived from the original purposes of statutory regulation of the insurance industry to protect policyholders and the insurance-buying public from abuses by insurers, "protection * * * which they could not secure for themselves" *(People v Formosa,* 131 NY 478, 483). "The function of [the Department of Insurance] is to ensure equity both to policyholder and company, not only in rates but in the extremely important realm of giving the public proper coverage in return for premium payments" *(Public Serv. Mut. Ins. Co. v Levy,* 87 Misc 2d 924, 926, *affd* 57 AD2d 794).

With respect to respondent's power to disapprove policy forms (Insurance Law § 3201), it has been held that disapproval is appropriate for provisions "likely to mislead the public * * * [or be] prejudicial to the interests of the policyholders" *(Matter of Massachusetts Mut. Life Ins. Co. v Thacher,* 15 AD2d 242, 247, *affd* 11 NY2d 923). However, denial of coverage or differential premium rates on the basis of sound underwriting practices accurately assessing risks/ future costs are not by nature misleading to the public or prejudicial to policyholders. Indeed, valid underwriting practices promote fairness to the policyholder in not requiring him or her to bear in premiums the costs of insuring others in higher risk categories, and solvency of the insurer, another goal of insurance regulation *(see generally,* Insurance Law art 42; 68 NY Jur 2d, Insurance, §§ 104-116, at 184-195).

Correspondingly, provisions barring discrimination against insureds, akin to Insurance Law § 4224 (b) (1), have been authoritatively construed not to apply when differential treatment has a proper underwriting basis. Thus, the statutory provision prohibiting discriminatory property and casualty rates (Insurance Law former § 180, present § 2301) has been interpreted as "seek[ing] to assure that the rate charged shall bear reasonable relation to or be commensurate with the risk assumed and adequate for the class of risk to which they

apply" *(Employers' Liab. Assur. Corp. v Aresty,* 11 AD2d 331, 335, *affd* 11 NY2d 696). And no violation of the law prohibiting discrimination by insurers based upon race, color, etc. (Insurance Law former § 40 [10], present § 2606), was held to have been committed by cancellation of fire insurance policies on commercial properties in heavily black-populated areas of New York City which "were motivated by underwriting and business reasons and not by racial hostility" *(British & Foreign Mar. Ins. Co. v Stewart,* 33 AD2d 1008, *affd* 30 NY2d 53).

It follows from the foregoing that a health insurance underwriting practice that is valid in reasonably assessing risks of future health costs on an actuarial basis cannot be prohibited by respondent under the authority of Insurance Law §§ 3201 or 4224. Such an underwriting practice is not unfair, inequitable, misleading or discriminatory. Indeed, as we have already discussed, appropriate classification of risks is sanctioned and encouraged throughout the Insurance Law. Without legislation more clearly suggesting that a specific, sound underwriting practice is condemned, an insurance regulation forbidding the practice is, in effect, a rule making illegal that which is permitted by law *(see, Matter of Campagna v Shaffer,* 73 NY2d 237, 243; *Boord v ʻO'Brien,* 277 App Div 253, 256-257, *affd without opn* 302 NY 890).

■ ■ In our view, there is not a rational basis to conclude that using HIV test results as a basis for classifying risks in determining insurability for individual and small group policies is not a sound underwriting practice.* It can hardly be denied that the present and potential AIDS epidemic represents a formidable financial threat of disastrous proportions to health insurers and the public fisc, and there is nothing in the record casting doubt on this fact. Thus, taking the most conservative projections in the record of the future increase in the incidence of AIDS, insurance underwriters are unquestionably justified in attempting to identify persons having a much higher than normal statistical likelihood of contracting AIDS or ARC as a special risk category for purposes of determining insurability. The only question then is whether there is similar justification, from a valid underwriting standpoint, to use

---

* The validity of HIV testing of applicants as an underwriting practice is a different question where large group insurance policies and the like are involved since, in those instances, the insurer is assessing the risk characteristics of the group as a whole, rather than that of the individual applicant *(see,* Clifford and Iuculano, *AIDS and Insurance: The Rationale for AIDS-Related Testing,* 100 Harv L Rev 1806, 1808-1809 [1987]).

responsible and practical HIV tests for identifying the *class* to be placed in that extraordinary risk category.

█ On the issue of the claimed invalidity of HIV testing as an underwriting tool to identify the class of applicants for individual or small group health insurance coverage significantly more at risk of getting AIDS or ARC, the findings of respondent are inadequate to support this conclusion and, in any event, a ban on testing for the reason of underwriting invalidity would lack a factual basis. In asserting underwriting invalidity, respondent relies entirely on the findings of the Commissioner of Health, in his certification pursuant to Insurance Law § 3217 (b) (4), that it "is not definitively known" how many HIV seropositive persons will progress to AIDS or ARC and that the ELISA and western blot HIV tests have not been officially approved as "diagnostic tests" for AIDS. These findings, however, only support the conclusion that, medically, in an individual case an HIV seropositive test result is an insufficient predictor of whether the patient tested will progress to AIDS. Clearly, it does not reject as irrelevant the use of HIV test results for actuarial purposes, i.e., as a means of identifying a class substantially more prone to AIDS than the general population. Nor could respondent or the Commissioner of Health have reasonably concluded that HIV test results are not highly relevant for such risk classification, on the basis of their own evidentiary showing here. At most, the data submitted in opposition to the petition suggest that the ELISA test currently employed to screen donations to the general blood supply yields an unacceptably high percentage of false seropositives.

The scientific literature submitted and relied upon by respondent and the Commissioner of Health, however, unambiguously supports the validity for underwriting purposes of more thorough HIV testing procedures. In an article submitted by respondent in the record, it was found that, for a *low risk* population (the group most likely to yield false positive results upon testing), repeated use of ELISA confirmed by the western blot assay would be 72% accurate in identifying those infected with the HIV virus, and similar testing of a *moderate* risk group would be almost 99% accurate. In the affidavit of Lloyd Novick, the Department of Health Director of the Center for Community Health (hereinafter the Novick affidavit), the principal submission in respondent's papers, the accuracy of "repeatedly reactive ELISA and reactive western blot" to identify HIV infection was estimated at a minimum of

91%. Respondent has not explained why he lacks the authority to regulate health insurers' HIV testing procedures so as to produce these more reliable results.

As to the correlation between HIV infection and ultimate progression to AIDS, the Novick affidavit flatly states that "AIDS and related conditions are *closely* associated with HIV infection" (emphasis supplied), and cites to authoritative articles and studies concluding that 30% to 50% of asymptomatic HIV infected persons will develop AIDS within 5 to 10 years after testing seropositive and predicting that 20% to 30% of those currently infected by HIV will develop AIDS by 1991. All of these statistics from respondent's own submissions overwhelmingly support the conclusion that HIV testing is sound for underwriting purposes in identifying a class at high risk of AIDS. Perhaps the best demonstration of the irrationality of respondent's contrary position is found in his alternative argument to ban insurer testing, on the ground that the practice will deter persons at risk of AIDS from submitting voluntarily to the very same tests. This contention would be totally lacking in substance if the tests were actually unreliable.

Moreover, again from an underwriting standpoint, respondent may not rely upon the fact that there might be a lag of an indefinite number of years between the onset of HIV infection and progression to AIDS. Because of statutory provisions limiting insurers regarding incontestibility and renewability after two years from the date of policy issuance (see, Insurance Law § 3216 [d] [1] [B] [ii]; [g]), any such delay would remain within an insurer's risk. These same statutory restrictions render inadequate the argument in the certification by the Commissioner of Health that HIV testing is unnecessary for insurers because of the availability of diagnostic tests for AIDS itself. Since HIV testing, as a sound underwriting practice, is not unfair, inequitable, discriminatory or deceptive, Insurance Law §§ 3201 and 4224 do not afford respondent authority to promulgate a regulation absolutely banning the tests.

We then turn to whether statutory support for the regulation can be found under Insurance Law § 3217 (b) (4), the remaining provision and one most heavily relied upon by respondent. Section 3217 empowers respondent to issue regulations establishing "minimum standards, including standards of full and fair disclosure, for the form, content and sale of accident and health insurance policies" (Insurance Law § 3217

[a]). Section 3217 (b) sets forth five enumerated "purposes of such minimum standards" to which regulations may be addressed. All of these but the purpose set forth in section 3217 (b) (4) can be fairly characterized as consumer protective in orientation, i.e., for "simplification of coverages to facilitate understanding and comparisons" (para [1]), and to eliminate: misleading or confusing provisions (para [2]), deceptive practices in connection with the sale of policies (para [3]) and "coverages * * * so limited in scope as to be of no substantial economic value to the holders" (para [5]). The legislative history of section 3217, including the legislative memorandum from the Executive Department concerning Insurance Law former § 174-a (as added by L 1971, ch 554, § 1) (1971 McKinney's Session Laws of NY, at 2441-2442) and the Governor's message of approval (1971 McKinney's Session Laws of NY, at 2619), clearly emphasizes the consumer protection aspect of the legislation.

■ Insurance Law § 3217 (b) (4), however, is couched in broader terms, identifying as a purpose of minimum standards the "elimination of provisions which may be contrary to the health care needs of the public, as certified to [respondent] by the commissioner of health". Nowhere in the legislative history is this provision specifically explained. Contrary to petitioners' argument, we do not conclude that by reason of its reference to the elimination of "provisions" contrary to health care needs, respondent's regulatory power is restricted to the form, content or language of insurance policies. Minimum standards extend generally to the "sale" as well as form and content of health insurance policies. Standards respecting the sale of such policies could be reasonably interpreted as giving power to respondent to issue regulations governing undesirable underwriting practices.

On the other hand, it is unreasonable, and clearly not supported by the legislative history, to construe Insurance Law § 3217 (b) (4) as giving respondent and the Commissioner of Health *carte blanche* to drastically disturb long-standing principles of accepted insurer underwriting practices in order to further the Commissioner of Health's own objectives in public health policy. Since there is hardly any aspect of health insurance that does not interrelate with public health policy, such a construction, in our view, would at the least move section 3217 (b) (4) toward, if not bring it directly into, conflict with the teachings of *Boreali v Axelrod* (71 NY2d 1).

■ The parallels to *Boreali v Axelrod (supra)* in the instant

case are substantial. As we have already demonstrated, a total ban on HIV testing to determine insurability cannot be justified as a prophylactic to an unsound underwriting practice, nor has respondent shown it to be necessary to satisfy apprehensions as to breaches of the confidentiality of seropositive test results. Without these underpinnings, the justification for the total prohibition against testing devolves to the concerns of the Commissioner of Health, expressed in his certification, as to the drastic social, economic and psychological impact on "asymptomatic" persons who test seropositive for HIV, the interference of mandatory HIV testing for health insurance with present efforts and programs to control AIDS by securing the voluntary cooperation of HIV seropositive persons, and the effect of the denial of health insurance to such persons on the limited financial resources of the State's Medicaid program. It is quite self-evident, however, that totally banning HIV testing for insurability on these grounds represents, as did the smoking regulation in *Boreali,* social policy decision-making in the broadest sense. Necessarily involved in the decision process is the weighing of the substantial increase in health care costs to insurers and/or increase in health insurance costs to non-HIV infected insureds included in the same risk pool as infected persons, if testing is disallowed, as against the serious financial and human costs to seropositive persons and the financial costs to the State if testing is permitted. As one advocate for banning testing has, with admirable candor, put it, "[a]lthough some opponents of HIV antibody testing by insurers question the test's accuracy, the primary argument against such testing is one of social policy, not medical reliability. * * * Any public policy analysis of the issue of HIV antibody (or viral) testing must weigh the cost to insurers of forbidding the test against the cost to society of allowing it" (Schatz, *The AIDS Insurance Crisis: Underwriting or Overreaching?,* 100 Harv L Rev 1782, 1793-1794 [1987]). Neither respondent nor the Commissioner of Health has any special technical expertise in deciding the fundamental question of how the potentially enormous financial and human costs of the AIDS crisis should be borne within society *(see, Boreali v Axelrod, supra,* at 14).

Also here, as in *Boreali v Axelrod (supra),* the far-reaching and controversial social policy decision to ban testing was "[written] on a clean slate * * * without benefit of legislative guidance" *(Boreali v Axelrod, supra,* at 13). Respondent has not cited to any section of the Insurance Law directly address-

ing the policy choices involved in whether insurers should be allowed to use HIV test results to determine insurability or special rate categories for HIV seropositive persons, whether some form of health insurance should be made available to all such persons through, e.g., a joint special risk pool or, indeed, establishing a general policy toward universal availability of health insurance regardless of special risk. On three occasions legislative proposals to ban HIV testing by insurers have been formulated, but only once has a bill been introduced (1986 Governor's Program Bill introduced as A10501), and it was not voted out of committee. Subsequent to the promulgation of 11 NYCRR 52.27, legislation was enacted conditioning testing for HIV by an insurer on its obtaining the informed consent of the applicant (Insurance Law § 2611, as added by L 1988, ch 584, § 3). The section specifically disclaimed any legislative intent either to sanction or restrict respondent's administrative authority to prohibit or allow testing (Insurance Law § 2611 [f]). Although both petitioners and respondent point to section 2611 as authority in their favor, its clearest indication is one of legislative indecisiveness on the policy issue.

Our reliance upon *Boreali v Axelrod (supra)* is not to imply that, under the separation of powers doctrine, the Legislature could not have delegated broad power to respondent to alter accepted insurer underwriting practices in order to implement a legislative policy to guarantee adequate coverage for a favored class of persons *(see, e.g.,* Insurance Law § 3216 [c] [4] [B]; [i] [6] [A]; [j] [2]; § 3218 [Medicare-related health insurance provisions]). Nor do we intend to exclude any scope whatsoever to respondent's power, under section 3217 (b) (4), to provide minimum standards for writing and selling health insurance to correct insurer abuses or modify insurer practices, consistent with established norms of the Insurance Law, when needed to prevent adverse effects on public health as identified by the Commissioner of Health. For example, on the basis of the Commissioner of Health's concerns regarding the incidence and effects of false seropositives resulting from superficial ELISA testing and the adverse effect of breaches of confidentiality as to test results, respondent presumably could provide by appropriately drawn regulations, for more rigorous, albeit practical, HIV testing procedures by insurers and for prevention of public dissemination by insurers of information regarding seropositive test results.

However, respondent exceeds his authority when, by regulation, he "effect[s] [his own] vision of societal policy choices"

*(Matter of Campagna v Shaffer,* 73 NY2d 237, 242, *supra)* over subjects not contemplated or acted upon by the Legislature and, in doing so, substantially eliminates sound underlying practices previously sanctioned and encouraged under basic principles of insurance law and regulation. In such an instance, once again, an administrative determination of public health policy makes unlawful what the Legislature chose to make fully lawful *(see, supra,* at 243). Since we have concluded that respondent did, thus, exceed his delegated authority here, 11 NYCRR 52.27 is invalid. The appropriate remedy is to convert this CPLR article 78 proceeding to a declaratory judgment action (CPLR 103 [c]) and declare its invalidity *(see, Matter of Broome County v New York State Bd. of Equalization & Assessment,* 145 AD2d 153).

KANE, J. P., CASEY, MIKOLL and YESAWICH, JR., JJ., concur.

Judgment modified, on the law, with costs to petitioners, by converting the proceeding to an action for a declaratory judgment and declaring that 11 NYCRR 52.27 is invalid, and, as so modified, affirmed.